UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 20-129(2) (NEB/HB) |
| | ) | |
| v.                   Plaintiff, | ) | **DEFENDANT'S POSITION** |
| | ) | **PLEADING** |
| MCKENZY ANN DEGIDIO DUNN, | ) | |
| | ) | |
| Defendant. | ) | |

McKenzy Ann DeGidio Dunn was orphaned at thirteen when her mother died from aggressive brain cancer. Her biological father was absent from her life and McKenzy's stepfather abandoned her and her younger brother following her mother's death.

McKenzy was already traumatized from the year of seizures and black-outs her mother suffered and by the responsibility of caring for her despite being only twelve. She'd been forced to grow up fast. McKenzy had to be there for her younger brother who needed her, all the while living with the constant worry of losing her mother. She had to handle more than any twelve-year-old should have to bear.

Thus, when her mother eventually passed, McKenzy felt an emotional void. Fortunately, her stepfather's parents took in McKenzy and her brother, their biological grandson. And McKenzy and H.B. were eventually adopted. Their grandparents were good, kind people who did their best, but McKenzy was already withdrawn and damaged.

In her teen years, McKenzy's grandparents began to take in foster children and McKenzy enjoyed growing up with foster siblings. She liked holding the babies and playing with the little kids, but her same-age foster sister, Minnie, became her closest

friend. Like many of the foster siblings who lived in the home, Minnie is Native American and was treated differently than McKenzy in their small, rural town.

The racism Minnie experienced and the way some people treated her incensed McKenzy.  McKenzy felt the injustice of Minnie's treatment and became an advocate for her when they were together, just as McKenzy did for her Black cousins and bi-racial friends from school. She wanted her family and friends to know that she saw the prejudice, discrimination, and injustice they endured. And she wanted them to know that she would stand up for them and be their ally in their mostly white community.

When George Floyd was murdered on May 25, 2020, McKenzy had a knee-jerk, human reaction to the video of his death. She posted her frustration and anger on Facebook and headed to the protests to show her solidarity. She wanted others to know, that although she is white, she saw the prejudice, discrimination, and unjust treatment of George Floyd and other people of color. She went to the protests with good intentions. Unfortunately, she went with some people she had only met a few days prior.

On May 28, 2020, nineteen-year-old McKenzy went to the protests in the Midway area of St. Paul. Like other protestors, she marched on the sidewalks.  But she also went in and out of some of the businesses with her new acquaintances. When she entered the Great Health & Nutrition store, the people she was with destroyed the shelving and display cases and collected coins from a spilled cash register. But McKenzy did not participate. She leaned on a counter and then sat on the floor watching. She drank a Red Bull energy drink from a cooler that another person threw to her and she took face masks from the store to

pass out to other protestors. She did not get involved in the destruction until the very last minute.

As Ms. DeGidio Dunn was about to leave the Great Health & Nutrition store, she picked up an 8 ounce bottle of hand sanitizer from the counter where she stood and poured its contents on a bookshelf where her co-defendant was attempting to light a second fire. Eventually, a small fire started, triggered the sprinkler system, and extinguished the flames. But the water damage was done and a high-tech video surveillance system caught it all.

For her singular act, Ms. DeGidio Dunn was federally indicted and pleaded guilty to a felony, one count of conspiracy to commit arson in violation of 18 U.S.C. §844(i) and 18 U.S.C. §341.  She now stands before the Court as a first time offender with no prior criminal charges nor arrests.

Ms. DeGidio Dunn has received a copy of the Presentence Report and has no objections to the factual basis. She submits, however, that a 4-level reduction to her sentence is appropriate for the minimal role she played in the attempted arson. *See* U.S.S.G. §3B1.2. As such, she submits that in Criminal History Category I, the appropriate total offense level is 13 and the advisory guideline range is 12-18 months of imprisonment.

In consideration of the 18 U.S.C. § 3553(a) factors, however, Ms. DeGidio Dunn respectfully asks the Court to consider her age at the time of the offense, her background, the specific circumstances of the attempted arson, and other goals in federal sentencing. In doing so, she respectfully asks the Court to consider a term of federal probation with restitution and community service, an opportunity to repair the damage she caused, in lieu of prison.

3

## LEGAL ANALYSIS

In *Gall v. United States*, 128 S.Ct. 586 (2007), the United States Supreme Court clarified the two-step process to be followed in federal sentencing. The sentencing judge must first determine the guidelines range applicable to the defendant. *Id.* at 596. Then, the court must consider the factors in 18 U.S.C. § 3553(a) and determine whether a departure or a variance is appropriate. *Id*. at 596-97; *United States v. Pepper*, 131 S.Ct. 1229, 1241 (2011) (court required "to tailor the sentence … based on appropriate consideration of all the factors listed in § 3553(a)"); *United States v. Roberson*, 517 F. 3d 990, 993 (8th Cir. 2008). In so doing, the Court is "to make an individualized assessment based on the facts presented" and must impose a sentence that is sufficient but not greater than necessary to accomplish the many goals of federal sentencing. *Id*.

Although an analysis of the guidelines is the first step in tailoring an appropriate sentence, the guidelines cannot be applied in a vacuum. The history and characteristics of Ms. DeGidio Dunn and the circumstances of her offense must first be understood. Thus, this pleading will first address Ms. DeGidio Dunn and the crime she committed. Then, the second portion of this pleading will return to the appropriate guideline calculation and the remaining 18 U.S.C. § 3553(a) factors.

## I.   THE HISTORY AND CHARACTERISTICS OF MCKENZY DEGIDIO DUNN

Throughout her childhood, McKenzy's mother kept her from seeing her biological father. But when McKenzy was approximately two, her mother started seeing another

4

man, N.B., who eventually became her stepfather. When McKenzy was four, her younger brother, H.B. was born. Sadly, it was always clear to McKenzy that she was not N.B.'s child.  He treated her differently than her brother and McKenzy's mother.

McKenzy and H.B. were raised together in Moorhead, Minnesota until McKenzy was eight and in the third grade.  Her uncle had been living with them after prison and committed a new robbery, bringing the police to their house, and creating a stand-off. After a shoot-out ensued, their family was evicted.

McKenzy's family then moved to Starbuck, Minnesota and her mother began working at a custom design business apparel shop. N.B. never held a job for very long, and instead went from job to job in carpentry and on pig farms. Still, McKenzy and H.B. had stability, all their needs met, and the love of their mother.

**Cancer**

Sadly, when McKenzy was twelve years old she learned that her mother was sick. It began with her mother passing out, waking up on the bathroom floor, and having bruises from unknown accidents. Her mother eventually underwent an MRI and a tumor-like mass was discovered in her brain.

On June 7, 2013, McKenzy's mom had a biopsy on the tumor but the family had to wait two weeks for the results. Then, one day, when McKenzy returned from her friend's house, her nine-year-old brother blurted out, "mom has cancer." The tumor was, in fact, an aggressive form of brain cancer.

McKenzy's mother lived another eleven months, to May 14, 2014. And those eleven months were exceptionally hard for McKenzy. N.B. had to work to support the

family, so it was McKenzy who sat through her mother's seizures and held her head. And it was McKenzy who had to care for her mom, all the while keeping herself calm for her nine-year-old brother.

Her mother decided to forego chemotherapy – the prognosis wasn't good anyway, and she didn't want to be sick in the time she had left. They all knew that she was dying. Still, McKenzy refused to believe she would actually die and always told herself her mother would get better.

But by the end of April of 2014, McKenzy's mother had been in the hospital for a month.  McKenzy stopped going to school to stay with her mother every day and at night she slept at her aunt's house. Yet even when her mother was in the hospital in a catatonic state, McKenzy thought she would get better and come home.

Sadly, McKenzy couldn't talk to her mother about her feelings. The nurses routinely came into the room to shine a flashlight in her mother's eyes to see if they would move and for a while they did. So, believing she could hear her, McKenzy talked to her, told her she loved her and that she wanted her to wake up.  Alas, the last reciprocal interaction they had was when her mother awoke from her catatonic state one last time and didn't know where she was or how she got there.  McKenzy's mother was hysterical and angry and went into another seizure before slipping back into unconsciousness.

McKenzy was in the hospital the day her mom's eyes stopped responding to the nurse's flashlight and the life support was discontinued.  She was thirteen when her mother passed away. And despite everything she knew and saw, McKenzy was beside herself. She was unprepared for a life without her mother.

**Life Without Her Mother**

McKenzy, her brother, and her stepfather N.B. moved in with her stepfather's parents. And N.B. almost immediately disappeared. They had no idea where he went until he resurfaced nine months later to see McKenzy's brother and then disappeared again.  After that he rarely had contact with H.B and McKenzy.  N.B. never established a place of his own and never came back for them.

Thus, N.B.'s parents, who McKenzy had been calling grandma and grandpa, adopted her and H.B. when McKenzy was sixteen.  McKenzy attended Minnewaska High School in Starbuck and played in the band. She started on the trumpet, then took up the French horn, then the baritone and ultimately the trombone. Being in band and band practice was her favorite part of high school. She made two close friends and never got in any real trouble, except for occasionally skipping a class or arriving late. She first tried marijuana at sixteen, but never tried any other drugs.

The same year her adoption became official, her adoptive parents began taking in foster children. Thus, from the time she was sixteen until she was eighteen, seven foster siblings lived with McKenzy, H.B. and their family. It was always exciting when a new child or children came to live with them. McKenzy particularly enjoyed having an infant and the younger kids, who ranged from four to six years around. And then there was Minnie.

Minnie was sixteen, just like McKenzy, when she came to their home. Minnie came from a difficult family life, but she was smart, outgoing, and fun. The two girls bonded immediately. Minnie started high school with McKenzy and joined her friend

group. The other kids at Minnewaska High School weren't very welcoming to Minnie. Being Native American in their small town wasn't easy.

Ultimately, Minnie left and returned to her Reservation when she was eighteen. It was sad for McKenzy, but they girls knew that they were sisters for life and that they would stay in contact.  The two still maintain a close relationship.

Thus, at eighteen, after graduation from high school, McKenzy moved out of her grandparent's house in Starbuck and moved to the Twin Cities.  She wanted to establish a relationship with her biological father, but her grandparents didn't approve.  They told her if she left, she had to take all of her stuff. And she knew she wouldn't be able to return. They ignored her until she left.

McKenzy moved to the Twin Cities and lived with her biological father, A.J., and his girlfriend. McKenzy got a job working at Smart Data Solutions in Eagan and worked there for approximately one year.

At nineteen, in August of 2019, McKenzy started dating a 27 year old, unemployed man who lived in his mother's house.  His mother had moved in with her parents to care for them, so McKenzy was invited to live with her boyfriend after only a month in their relationship.

Unfortunately, the older boyfriend was manipulative and controlling.  He punched holes in walls and threw stuff when they fought to scare McKenzy. When he apologized, he said he would kill himself if she ever left. Not wanting to burden her father, with whom she'd only just started a relationship, McKenzy felt stuck. She stayed in the

abusive relationship much longer than she should have. And she lost 30 pounds as a result of the stress and anxiety the relationship caused her.

Ultimately, she left. But to get out, McKenzy had to give up her new car – that she bought with her mother's life insurance money – and her service dog, Onyx.  Although Onyx was certified as her emotional support animal and McKenzy trained her, her boyfriend kept Onyx. There was no way for McKenzy to get her back.

McKenzy moved back in with her biological father, his girlfriend and her newborn half-brother, whom she agreed to care for while her father and his girlfriend worked. McKenzy was grateful to have her father in her life and happy to have a newborn to love – and love her back.

McKenzy DeGidio Dunn has had a tough time since her mother died, but she'd never been in trouble with the law nor arrested until this case.


## II.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

On May 25, 2020, George Floyd was murdered by Minneapolis Police Officer Derek Chauvin.  His slow death was filmed by a young woman at the scene, who posted the video on social media. The recording went viral. It is a very difficult video to watch and, like many, McKenzy DeGidio Dunn had a visceral reaction.

By Tuesday morning, May 26, 2020, local and national news outlets had picked up the story about Mr. Floyd's death, and by Tuesday afternoon, thousands of people were gathered in the area of 38th and Chicago Avenue to protest the murder of Mr. Floyd. Ms. DeGidio Dunn began to feel restless and began posting on Facebook.



But as the video spread, outrage spread.  More protestors came, people drove in from other states and overnight, Minneapolis became the world's representative epicenter for injustice and police brutality.

Following the mostly peaceful protests on Tuesday night, the cities of Minneapolis and St. Paul began to experience rioting.  Clashes between protestors and police worsened. And despite heavily armed officers shooting rubber bullets and tear gasing the crowds, the protestors far outnumbered law enforcement. Things got out of hand before the National Guard was called in for help.  People rioted, vandalized and destroyed. Buildings were looted and burned. Ms. Degido Dunn continued to share her frustration and the frustration of others on Facebook.







Amid her posts, Ms. DeGidio Dunn went to the protests with some acquaintances she'd

met only a few days before. She didn't have a lot of friends in the Twin Cities area.

On May 28, 2020, Ms. DeGidio Dunn went to St. Paul, Minnesota with her co-

defendant, Samuel Frey, and his younger sister. She'd been invited by a mutual friend,

but he decided not to stay. Thus, Ms. DeGidio Dunn, Mr. Frey and his sister walked

down the sidewalks with other protestors and went in and out of businesses that had

already been broken into. Most of the businesses had broken windows, holes in walls,

and stuff scattered all over floors.

In the Target store parking lot they met Bailey Baldus, whose indictment was previously dismissed. She was friends with Mr. Frey's sister. Ms. DeGidio Dunn had never met her before. Together, the four of them entered a Verizon store, a Vitamin Shoppe and the Great Health & Nutrition store.

The surveillance video from the Great Health & Nutrition store shows Ms. DeGidio Dunn attempting to catch Red Bull drinks being thrown to her, standing next to a counter, going through her backpack and sitting on the floor as Mr. Frey and others walk around the store pulling down shelving units and breaking glass display cases.  Ms. DeGidio Dunn did not participate in any of this.

Further into the video, Mr. Frey attempts to start a small fire near Ms. DeGidio Dunn by using a cigarette lighter on magazines. But this fire never got started and Mr. Frey moved on.  At the end of the video, Mr. Frey attempts to start a second fire on a bookshelf by spreading hand sanitizer and lighting magazine pages with a cigarette lighter. Eventually, as everyone is leaving the store, Ms. DeGidio Dunn grabbed a nearby bottle of hand sanitizer and squeezes it onto the bookshelf where Mr. Frey is starting a fire.

## THE GUIDELINES

III.     AS A MINIMAL PARTICIPANT IN AN ATTEMPTED CONSPIRACY, MS. DEGIDIO DUNN SHOULD RECEIVE A 4-LEVEL REDUCTION PURSUANT TO U.S.S.G. § 3B1.2(A).

Ms. DeGidio Dunn asks the court to apply a 4-level reduction for playing a minimal role and being a minimal participant in the conspiracy to commit arson under

U.S.S.G. §3B1.2(a). This section of the United States Sentencing Guidelines provides that a defendant may receive a mitigating role reduction if the defendant "plays a part in committing the offense that makes [her] substantially less culpable than the average participant in the criminal activity." Specifically, a minimal role is warranted if the defendant is "plainly among the least culpable of those involved in the conduct of a group." *Id*. Even if "a defendant performs an essential or indispensable role in the criminal activity," the defendant "may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant." *Id.*

### A. Ms. DeGidio Dunn's Conduct Fits the Criteria for a Minimal Role Reduction.

Application note 3(C) sets forth the relevant factors for making the fact-based determination in whether to apply USSG §3B1.2's minimal role reduction and instructs the court to consider:

(i)   the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)  the degree to which the defendant participated in planning or organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)  the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and

(v)   the degree to which the defendant stood to benefit from the criminal activity.

These criteria were recently added to the Guidelines in 2015, through Amendment 794, as "a result of the Commission's study of §3B1.2 (Mitigating Role)."[1] In their review of the Mitigating Role guideline, the Commission "conducted a review of cases involving low-level offenders, analyzed case law, and considered public comment and testimony." *Ibid.*

"Overall, the study found that mitigating role is applied inconsistently and ***more sparingly than the Commission intended***." *Ibid.* (emphasis added). "In economic crime cases, the study found that the adjustment was often applied in a limited fashion[,]" and the Commission noted "that courts often deny mitigating role to otherwise eligible defendants if the defendant was considered 'integral' to the successful commission of the offense." *Ibid.* Thus, the Commission made clear that its amendment was intended to "address[] . . . case law that may be discouraging courts from applying the adjustment in otherwise appropriate circumstances." *Ibid.*

After surveying a jurisprudence split as to the determination of what constitutes an "average participant," the Commission "adopt[ed] the approach of the Seventh and Ninth Circuits" over the more expansive position of the First and Second Circuits. Accordingly, the Commission "revis[ed] the commentary to specify that, when determining mitigating role, the defendant is to be compared [only] with the other participants 'in the criminal activity'" instead of with "'the universe of persons participating in similar crimes.'" *Id.* at 34-35 (citing *United States v. Benitez*, 34 F.3d 1489, 1498 (9th Cir. 1994), *United*

---

[1] United States Sentencing Commission, *Amendments to the Guidelines* at 34 (eff. Nov. 1, 2015)*, available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/20150430_Amendments_0.pdf (last visited April 30, 2021).

*States v. Cantrell*, 433 F.3d 1269, 1283 (9th Cir. 2006), and *United States v. DePriest*, 6

F.3d 1201, 1214 (7th Cir. 1993)).

The Commission furthermore explained that its 2015 Amendment represented a

rejection of "cases [in which] a defendant . . . [was] denied a mitigating role adjustment

solely because he or she was 'integral' or 'indispensable' to the commission of the

offense." *Id.* at 35 (citing, *inter alia*, the example of *United States v. Deans*, 590 F.3d 907,

910 (8th Cir. 2010) ("Numerous decisions have upheld the denial of minor role adjustments

to defendants who . . . play a critical role").  Thus, the Commission explained, "a finding

that the defendant was essential to the offense does not alter the requirement, expressed in

Note 3(A), that the court must assess the defendant's culpability relative to the average

participant in the offense" and that such a defendant "may receive a mitigating role

adjustment, if he or she is otherwise eligible." *Ibid.*

Other aspects of the 2015 Amendment confirm the Commission's significant

interest in encouraging sentencing courts to apply the mitigating role downward adjustment

in appropriate circumstances, including situations analogous to the present matter.  The

2015 criteria establish that Ms. DeGidio Dunn's role was significantly different from that

of her co-defendant and co-conspirator, Samuel Frey, and a minimal role reduction is

appropriate.

First, Ms. DeGidio Dunn did not go to the protests with an agreement to destroy

property nor commit arson. Rather, she entered into the agreement at the last minute by

spreading approximately eight ounces of hand sanitizer on a bookshelf when her co-

defendant, Samuel Frey, attempted to start a second fire. Second, Ms. DeGidio Dunn did

not plan nor organize the criminal activity and did not destroy other property inside the

Great Health Nutrition store. She was merely present as others destroyed glass display

cases, bookshelves and other items. Third, Ms. DeGidio Dunn did not exercise decision-

making authority and did not influence the exercise of decision-making authority. Mr.

Frey appeared determined to start a fire in the Great Health & Nutrition store with or

without any help from others present. And Ms. DeGidio Dunn barely knew her

accomplices and had no control over their actions. Fourth, Ms. DeGidio Dunn's sole act

was de minimus, lasted only a few seconds, and very little damage resulted from her

actions. Fifth, Ms. DeGidio Dunn stood to benefit very little from her act of squirting

hand sanitizer on the bookshelf.

### B.  The Minimal Participant Reduction Does Not Require a Large Scale Conspiracy

As the State notes, the conspiracy in this case did not involve a criminal enterprise

with a structured, hierarchical, or organized group of participants. Therefore, there is "no

information to suggest Samuel Frey (hereinafter "Frey") or any other participants planned

the offense, exercised decision-making authority, or benefitted from the offense." Final

Pretrial Services Report "PSR" Addendum at A.2. While the conspiracy is therefore

limited both in duration and depth of involvement to the events at the Great Health

Nutrition Store, based on those events there is sufficient evidence to find that Ms.

DeGidio Dunn is substantially less culpable than the average participant in the

conspiracy, namely Mr. Frey, who attempts to start at least two fires.

The Eighth Circuit has established a test for determining whether a mitigating role reduction is warranted under§ 3B1.2(b), regardless of the scope or size of the conspiracy. "'To determine whether a reduction is appropriate,' the court compares 'the acts of each participant in relation to the relevant conduct for which the participant is held accountable' and measures 'each participant's individual acts and relative culpability against the elements of the offense.'" *United States v. Johnson*, 408 F.3d 535, 539 (8th Cir. 2005) (citing *United States v. Johnson,* 358 F.3d 1016, 1018 (8th Cir. 2004)). *See also United States v. Ramos-Torres* 187 F.3d 909, 915 (8th Cir.1999); *United States v. Thurmon*, 278 F.3d 790, 792 (8th Cir. 2002)).

Therefore, the court must first determine the relevant conduct for which Ms. DeGidio Dunn is being held responsible and the specific acts Ms. DeGidio Dunn committed. She pleaded guilty to conspiracy to commit arson and thereby admitted that she attempted "to damage or destroy, by means of fire … any building … used in interstate or foreign commerce." 18 U.S.C. §844(i). But Ms. DeGidio Dunn did not light the flame nor put the flame to paper in an attempt to ignite a fire as her co-defendant twice did inside the Great Health & Nutrition store. In fact, while Ms. DeGidio Dunn stands at a counter and sits on the floor, her co-defendant appears determined to cause as much damage to the store as possible.





Ms. DeGidio Dunn added hand sanitizer to a bookshelf while her co-defendant attempted to light a second fire. *See* Great Health Nutrition Store Surveillance Video, Named in Part 20200528_195527, "Video 2" (ECF #1, Complaint at 15). As a result of these acts, two shelves and the wall immediately behind and above them sustained "fire damage in the form of charring, discoloration and soot and smoke deposits." *Id*. (ECF #1, Complaint at 8).



The single act Ms. DeGidio Dunn committed within this conduct was spreading a small amount of hand sanitizer over the shelf, which Mr. Frey then lit on fire. (Video 2 at 2:44-2:59; 3:40-3:44). Ms. DeGidio Dunn spread hand sanitizer only at the last minute, and only after Mr. Frey had already spread over a bottle of hand sanitizer on the shelves and attempted to light magazines on fire. (*Id.* at 1:20-2:25; 2:35).

While the conspiracy in this case was limited in duration and scope, within that duration and scope Ms. Dunn played a minimal role. First, Ms. DeGidio Dunn's conduct lasted for a significantly less amount of time. While Mr. Frey spent approximately 2 minutes and 22 seconds trying to start a fire, Ms. DeGidio Dunn's participation lasted only 19 seconds. (Video 2 at 1:20-3:44.) Mr. Frey first tried to start a fire approximately 1 minute and 20 seconds into Video 2, when he poured an entire bottle of hand sanitizer on a shelf he previously knocked down. *Id.* at 1:20-1:28. He spent nearly the rest of his time in the store either pouring hand sanitizer, spreading magazines, or attempting to light magazines on fire. *Id.* at 1:20-3:44. After he emptied the first bottle of hand sanitizer on the shelf, he picked up a magazine and began lighting it on fire. *Id.* at 1:33. He then continued to pour another bottle of hand sanitizer over the shelf. *Id.* 1:47-2:03. Next, he

grabbed more magazines and tried to light them on fire, too. *Id.* 2:04-2:14. Although he then moved slightly off camera, it appears he then lit magazines in the same location as the fire damage. *Id.* 2:14. During this time, he said "you have like five minutes, until I can figure out how to get this bitch burned." *Id.* 2:19-25.

Ms. DeGidio Dunn, on the other hand, was sitting down, putting on her shoe from approximately 1:20 until 2:35 minutes into Video 2. *Id.* at 1:20-2:35. She then stood up, grabbed a bottle of hand sanitizer, and from about 2:44 until 2:59 she presumably helped Mr. Frey spread hand sanitizer on the shelf, although she is off camera. *Id*. at 2:44-2:59. Ms. DeGidio Dunn then picked up her backpack and turned to leave, while Mr. Frey returned to the shelf with more hand sanitizer. *Id*. at 3:24-3:44. At the last second, Ms. DeGidio Dunn returned to the shelf, presumably to spread more hand sanitizer. *Id.* at 3:40-3:44. Therefore, while Mr. Frey spent 2 minutes and 22 seconds trying to start a fire, Ms. DeGidio Dunn's conduct lasted at most 19 seconds. Neither stayed long enough to ensure that the fire started and the actual fire damage was limited.



In addition, Ms. DeGidio Dunn's role was lesser in scope. She did not speak about starting the fire nor instigate any attempts to start the fire. The first person to mention starting a fire was Mr. Frey's sister, who asked if "Red Bull was flammable." Great Health Nutrition Store Surveillance Video, Named in Part 20200528_195153, "Video 1" at 2:25. The next statement made regarding arson is again made by Mr. Frey's sister, who said "we're lighting this bitch up." Video 2 at 1:17-1:19. Mr. Frey responded, "I've got hand sanitizer," as he took hand sanitizer out of his backpack and began pouring it over the shelf he just knocked down. *Id.* at 1:20. This is the first attempt by any co-conspirators to start a fire. *Id*. Mr. Frey's sister then said again, "yo, we're lighting this bitch up" and Mr. Frey said something else about hand sanitizer in response. Video 2 at 1:18-22. Mr. Frey continued to pour more hand sanitizer over the shelf. *Id.* at 1:47-2:03. At the same time, Mr. Frey's sister who had previously asked "is Red Bull flammable," pours Red Bull on the floor. *Id.* at 1:55-2:00. Mr. Frey then continued to try to start a fire until the 3:44 mark in the video. *Id.* at 3:44. During this time, Ms. DeGidio Dunn stated "he's, uhhh, lighting…. Dropping fire," while Mr. Frey lit magazines on fire and dropped them onto the shelf which he previously covered in hand sanitizer. *Id.* at 1:34. No other statements regarding setting a fire are attributable to Ms. DeGidio Dunn. *Id*. Ms. DeGidio Dunn participates last, spreading hand sanitizer for the first time at 2:44 minutes into Video 2. *Id.* at 2:44.

The role Ms. DeGidio Dunn played in this offense is therefore lesser in scope and duration than that of her co-defendant Mr. Frey. She is, therefore, deserving of a minimal role reduction under USSG §3B1.2.

21

## IV.      THE ADDITIONAL 18 U.S.C. §3553(A) FACTORS

The Supreme Court reiterated in *Gall v. United States*, 128 S.Ct. 586, 602 (2007),

that "the Guidelines are not mandatory, and thus the range of choice dictated by the facts

of the case is significantly broadened."  *Gall* requires that in addition to considering the

Guidelines, the "district court should … consider all of the 3553(a) factors to determine

whether they support the sentence requested by the party.  In so doing, he[she] may not

presume the Guidelines range is reasonable.  He[She] must make an individualized

assessment based on the facts presented."  *Gall*, at 596-96 (citations omitted); *see also*

*United States v. Miranda*, 505 F.3d 785, 791 (7th Cir. 2007) ("Although the guidelines are

treated as advisory after *Booker*, the application of section 3553(a) is mandatory.")

The Supreme Court requires judges "to impose a sentence sufficient, but not

greater than necessary to comply with the basic aims of sentencing" in § 3553(a), *Rita v.*

*United States*, 127 S.Ct. 2456, 2463 (2007), which includes the need for the sentence "to

reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment; to create adequate deterrence; to protect the public from further crimes of

the defendant and to provide the defendant with needed educational or vocational

training, medical care, or other correctional treatment in the most effective manner."  18

U.S.C. § 3553(a).  Section 3553(a)(1) also gives sentencing courts "a broad command to

consider 'the nature and circumstances of the offense and the history and characteristics

of the defendant.'"  *Gall*, 128 S.Ct. at 596 n.6.

> It has been uniform and constant in federal judicial tradition for the
> sentencing judge to consider every convicted person as an individual and

> every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.

*Koon v. United States*, 518 U.S. 81, 113 (1996). The Guidelines are only one factor of many the Court is to consider. *Gall*, 128 S.Ct. at 596. A criminal sentence, therefore, should adequately address and reflect how an individual got to this place in life.

### A.  The Need for Correctional Treatment in the Most Effective Manner

As noted above, other than this case, Ms. DeGidio Dunn has no criminal history. She has managed to do well and make a good life despite losing her mother as a child. One could easily see how Ms. DeGidio Dunn's life could have taken another path. But she stayed in school, graduated from high school, and has worked her entire adult life.

When her picture and video aired on television news and Ms. DeGidio Dunn realized that law enforcement was looking for her and her accomplices, she called the FBI tip line because she didn't know how to turn herself in. She gave the FBI her full name, date of birth, cellular phone number, residential address, email address and information regarding her involvement in the arson at the Great Health & Nutrition store. With this information, the FBI obtained an arrest warrant for Ms. DeGidio Dunn and went to the residential address she provided. There the FBI met Ms. DeGidio Dunn's father who called her and handed the phone to ATF Special Agent Laura Gulick.

Agent Gulick spoke to Ms. DeGidio Dunn who provided her with another address where she was staying with her boyfriend. When Agent Gulick and two other agents arrived at the address, they were invited into the home and arrested Ms. DeGidio Dunn in the living room. During Ms. DeGidio Dunn's transport to the federal courthouse, she

confessed to spreading some hand sanitizer where Mr. Frey was attempting to start a fire. ATF 778030-20-0071, Report 18.

Ms. DeGidio Dunn has taken this matter very seriously from the beginning.  On June 8, 2020, she contacted law enforcement, met with them, was arrested, and confessed to her involvement. She was then taken to federal court and spent the next four nights in jail before she was released on June 12, 2020. Before that, she'd never been arrested and certainly never spent the night in jail.

Since that time, Ms. DeGidio Dunn has ceased smoking marijuana, has routinely attended mental health therapy and has continued employment. She first worked as a cashier at a Speedway gas station, then she loaded trailers for UPS. As she struggled to keep up in the physically demanding job at UPS, she found other employment at Brighter Mission, where she helped people with mental disabilities and health issues get out of their homes and into the community. She took her clients to parks, malls, grocery stores and to their appointments as their driver and companion.

But Ms. DeGidio Dunn couldn't get enough hours at Brighter Mission, so she left to work as a personal care attendant for elders at HomeInstead.  Now, Ms. DeGidio Dunn serves seven clients. She provides transportation, grocery shopping, meal preparation, bathing, laundry, and cleaning (e.g. dusting, vacuuming and sweeping). Ms. DeGidio Dunn enjoys caring for others and worries that her felony conviction will prevent her from working with people with disabilities in the future.

Ms. DeGidio Dunn is doing good things in the community and she is taking care of her mental well-being and has abstained from using marijuana. She is not in need of correctional treatment and a term of federal probation would ensure her continued success.

### B.  Just Punishment, Adequate Deterrence and Protection of the Public

Ms. DeGidio Dunn is now twenty and will live the rest of her life as a federal felon.  It will prevent her from working in a number of fields, at a number of jobs and will keep her from getting apartments. It will be something she has to explain for the rest of her life.  For her crime, she has already lost much: her ability to pursue her dream to be a social worker and her ability to live a life unencumbered by a felony conviction.

Among the kinds of sentences available in this case, this Court should consider sentencing Ms. DeGidio Dunn to probation with substantial conditions, including restitution and community service.  The losses she has already incurred and the effect a felony conviction will have on her adulthood are sufficient. And the additional conditions will mete out the appropriate punishment, but will also recognize that a probationary sentence is no greater than necessary to fulfill all the purposes of sentencing.  Requesting such an alternative to incarceration for someone like Ms. DeGidio Dunn is not unusual.

> Increasingly, criminal justice professions have argued that dwindling prison space should be reserved for the most serious and dangerous offenders, necessitating a reconsideration of alternative sanctions for first-time and nonviolent offenders.[2]

---

[2] *Alternative Sentencing in the Federal Criminal Justice System*, UNITED STATES SENTENCING COMMISSION, January 2009, at 1.

In upholding a sentence of probation, the Supreme Court in *Gall* acknowledged that probation is a significant sentence, with even the standard conditions of probation carrying substantial restrictions of liberty.  *Gall*, 128 S.Ct. at 595-96 n.4.  In other words, probation may be punishment enough.  Additionally, the Supreme Court rejected the Eighth Circuit's previous conclusion that probation "lies outside the range of choice dictated by the facts" because § 3553(a)(3)(kinds of sentences available) "directs the judge to consider sentences other than imprisonment."  *Id*. at 602, n.11.

In this case, McKenzy DeGidio Dunn is a first time offender who committed her offense in 19 seconds without thinking and without contemplation of her future. Fortunately, her conduct caused minimal damage. So the question becomes, what is just punishment in this case?

The effects of her crime have already been significant on Ms. DeGidio Dunn's life. The primary need for incarceration in this case is the need to deter Mrs. DeGidio Dunn from acting without thinking ever again, but Ms. DeGidio Dunn does not need prison to be deterred. As her singular experience with the criminal justice system, Ms. DeGidio Dunn has already been scared straight.  She has abided by all of the conditions of her release, has abstained from the use of marijuana and has worked throughout her pretrial release. She intends to make something out of her young life and prison will do more harm than good.

Additionally, Ms. DeGidio Dunn does not pose a risk of danger to the community. Up until she succumbed to peer pressure while protesting the death of George Floyd, Ms. DeGidio Dunn has lived a law-abiding life.

At an annual cost of incarceration for one person in the Bureau of Prisons at $39,365.00, in a Community Corrections Center at $39,924.00, and under supervision by a United States Probation Officer at $4,465.00, it seems that society would be better served by Ms. DeGidio Dunn's performance of community service and repayment of restitution to the Great Health & Nutrition store. (PSR ¶ 93)  The societal benefit for the incarceration of Ms. DeGidio Dunn would be minimal. This is because Ms. DeGidio Dunn does not need any further deterrence, she is not a danger to the community, and she is unlikely to recidivate.

Over the past eleven months, Ms. DeGidio Dunn has proven that she can be an asset to the community and she has the ability to pay restitution and perform community service.  For these reasons, she hopes that the Court will consider that a sentence of federal probation would be sufficient and no greater than necessary to accomplish the goals of federal sentencing.

## IV.    CONCLUSION

For the above stated reasons, Ms. DeGidio Dunn respectfully requests that the Court consider a sentence of probation with the conditions that she:

1) continue with any recommended treatment for mental health and chemical dependency,

2) continue to remain employed,

3) pay monthly restitution to Great Health & Nutrition, and

4) serve a term of community service.

Such a sentence would be sufficient but no greater than necessary considering Ms. DeGidio Dunn's young age, her lack of criminal history, and the de minimus conduct of her crime.

Dated:  May 3, 2021                    Respectfully submitted,

                                       *s/Shannon Elkins*
                                       _____
                                       SHANNON ELKINS
                                       Attorney ID No. 332161
                                       Attorney for Ms. DeGidio Dunn
                                       107 U.S. Courthouse
                                       300 South Fourth Street
                                       Minneapolis, MN 55415