UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 20-CR-129-2 (NEB/HB)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

McKENZY ANN DEGIDIO DUNN,

        Defendant.

**POSITION OF UNITED STATES REGARDING SENTENCING**

The United States of America, by its attorneys, W. Anders Folk, Acting United States Attorney for the District of Minnesota, and Assistant United States Attorneys Matthew S. Ebert and Joseph S. Teirab, hereby submits its position regarding sentencing. The United States respectfully requests that defendant McKenzy Ann DeGidio Dunn be sentenced substantially below the Guidelines range of imprisonment and that she be ordered to perform community service focused on rebuilding and restoring damaged neighborhoods. Such a sentence justly and sufficiently punishes Ms. DeGidio Dunn for her reckless arson crime, deters her and others from repeating similar conduct, while also providing Ms. DeGidio Dunn an opportunity for reformation, all without being a punishment greater than necessary to achieve these ends.

**I.  MS. DEGIDIO DUNN'S MAY 28, 2020 ARSON IN ST. PAUL'S MIDWAY AREA.**

In late May 2020, the murder of George Floyd led to widespread protest in the Twin Cities area. While many protested and assembled peacefully, others unfortunately used the tragedy to engage in wanton destruction against innocent neighborhoods and small businesses through arson, violence, and looting. Sadly, Ms. DeGidio Dunn is one who chose a destructive path rather than a peaceful one. On

May 28, 2020, Ms. DeGidio Dunn and three others (including co-defendant Samuel Elliot Frey) joined a crowd of people who had gathered near a commercial strip mall at the intersection of University Avenue and Hamline Avenue in St. Paul, Minnesota. (PSR at ¶ 9). When Ms. DeGidio Dunn arrived on that scene, other individuals were already engaged in efforts to trespass, loot, and set fire to businesses and buildings. (*Id.*). She quickly joined those lawless and destructive efforts underway.[1]

Specifically, Ms. DeGidio Dunn, Frey, and their two associates trespassed in and out of multiple business before eventually entering into the Great Health and Nutrition Store, an independent supplement retailer, located within a commercial strip mall near University Avenue. (*Id.* at ¶ 10). Unbeknownst to Ms. DeGidio Dunn, the owner of the Great Health store, J.R., had earlier fled the scene but watched from afar in real time in with shock and dismay via a live-stream video surveillance camera. J.R. could only helplessly watch the conduct of Ms. DeGidio Dunn and her group that unfolded in his store. At one point, Frey smashed two display cases while his associates cheered. (*Id.* at 11). An individual in this group with Ms. DeGidio Dunn

---

[1] The destructive events of May 28, 2020, were not Ms. DeGidio Dunn's first venture with Frey, but rather, they appear to be a continuation of conduct together in late May 2020. For instance, as noted in the PSR, the contents of Frey's cellular phone include videos recorded on May 27, 2020 (one day prior to the Great Health and Nutrition fire). (*Id.* at ¶ 18). One video appears to depict three individuals in a car (including Ms. DeGidio Dunn) and two banker's envelopes containing large amounts of cash. (*Id.*). The video appears to be taken by Frey, and at one point, Frey brags about having just stolen money from retail stores' safes as Ms. DeGidio Dunn sits with Frey in the same car. (*Id.*). To be clear: there is no indication that Ms. DeGidio Dunn, other than being present, engaged in this apparent May 27, 2020 conduct that is depicted by Frey's video recordings. However, the fact remains that Ms. DeGidio Dunn had already made a concerted choice to continue being a part of dangerous, lawless behavior when she arrived at St. Paul's Midway area with Frey and others the following day on May 28, 2020.

stated twice that, "We're lighting this bitch up," in reference to J.R.'s store. (*Id.*). As Ms. DeGidio Dunn stood nearby, Frey opened a bottle of hand sanitizer and poured the contents on shelving units that Frey and another knocked down. (*Id.* at ¶ 12). Someone in Ms. DeGidio's party yelled, "We don't got to worry. It'll all be burned." (*Id.*).

At one point, Frey used a lighter to set a sheet of paper on fire and placed the flaming paper onto the area of the downed shelving unit where he had poured hand sanitizer. (*Id.*). Throughout these events, Ms. DeGidio Dunn voiced her involvement in the arson conduct stating, for example, "Who's got a lighter?"; "He's [Frey] ahhh lighting"; and "He [Frey] lit the fire!" (*Id.* at ¶ 19). Ms. DeGidio Dunn and Frey remained inside the store while the two others left and waited outside. (*Id.*). As Ms. DeGidio Dunn stood nearby, Frey used a lighter to set a magazine on fire and approached another shelving unit. (*Id.* at ¶ 13). Frey said, "You have like five minutes ... until I can figure out how to get this bitch burned." (*Id.*). Frey then placed the flaming magazine onto the shelving unit. (*Id.*). Frey and Ms. DeGidio Dunn each had bottles of hand sanitizer, and they both poured the contents onto the shelving unit to accelerate the fire. (*Id.*). Frey and Ms. DeGidio Dunn momentarily stepped away from the shelving unit to look towards the store entryway and then returned to apply additional hand sanitizer. (*Id.*).

Eventually, when Ms. DeGidio Dunn and Frey exited and rejoined their group outside, there was smoke inside the Great Health store. (*Id.* at ¶ 19). As Ms. DeGidio Dunn and the others walked away from the Great Health and Nutrition Store, Frey discussed how fun it had been to start the fire. (*Id.*). The group subsequently entered

3

a nearby vitamin store where Ms. DeGidio Dunn and Frey went to a back office and discussed an easier way to start a fire, a recurring topic of conversation between the two that continued again when they subsequently went to a nearby cell phone store. (*Id.*).

The fire started, in part, by Ms. DeGidio Dunn at the Great Health and Nutrition Store eventually self-extinguished. (*Id.* at ¶ 15). J.R.'s business nonetheless suffered damage throughout as a direct result of Ms. DeGidio Dunn. An ATF Special Agent and Certified Fire Investigator examined the store and determined that a shelving unit along an interior wall, as well as the wall itself, sustained fire damage in the form of charring, discoloration, and soot and smoke deposits. (*Id.*). The Certified Fire Investigator also observed light smoke deposits on the HVAC air intakes and discharge vents located in the drop ceiling. (*Id.*). Also, water damage impacted virtually all of J.R.'s business due to overhead sprinklers that went off in reaction to the fire started, in part, by Ms. DeGidio Dunn.

For the victim business owner, J.R., the damage wrought by Ms. DeGidio Dunn's conduct is far more destructive than simply the financial impact. Moreover, Ms. DeGidio Dunn's conduct did not simply victimize the small business, but it also damaged the broader community and left neighborhood employees out of work, as J.R. stated below:

> The destruction and arson of my store happened at a time in my life that should have been one of the most joyful, the birth of our first grandchild. Instead of being totally able to enjoy and fully participate I found myself having to deal with clean up, insurance and contractors, all of which are very frustrating and time consuming. Our 33 year old neighborhood business was shut down and my neighborhood employees out of work. The community no longer had access to health products, in particular immune products, during a pandemic. Having watched it take place on a live stream further added to my anxiety and I now

4

relive it, often particularly in my dreams. I suffer from PTSD and am always thinking it will be repeated. I do not sleep well and it has [a]ffected my mood and outlook and how I look at people. To say this has impacted me is a[n] understatement to say the least.

*See* Dkt. 85 (Victim Impact Statement of J.R.).

## II. PROCEDURAL HISTORY AND SENTENCING GUIDELINES CALCULATIONS.

As a result of her conduct, Ms. DeGidio Dunn was arrested on June 10, 2020, pursuant to a criminal complaint charging her with conspiracy to commit arson, in violation of 18 U.S.C. §§ 371 and 844(i). (*See U.S. v. Degidio Dunn, et. al,* 20-mj-365 (HB)). Subsequently, on July 28, 2020, Ms. DeGidio Dunn was charged in a superseding indictment involving the same violation. (PSR at ¶ 1; Dkt. 39). On October 26, 2020, Ms. DeGidio Dunn pleaded guilty to the superseding indictment's conspiracy charge without a plea agreement. (PSR at ¶ 2; Dkt. 58).

As set forth in the PSR, the **base offense level is 20** for the offense of conviction (conspiracy to commit arson) pursuant to U.S.S.G. §§ 2X1.1(a) and 2K1.4(a)(2)) because the offense involved the attempted destruction of a structure other than a dwelling or specified facility (PSR at ¶ 29). The offense level is **decreased by 3 levels** pursuant to § 3E1.1(a) and (b) because of Ms. DeGidio Dunn's acceptance of responsibility. (*Id.* at ¶ 36). Thus, with a criminal history category of I, the **total offense level is 17**, which results in an **advisory Guidelines range of 24 to 30 months of imprisonment**. (*Id.* at ¶ 84).

The Sentencing Guidelines fine range is $10,000-$95,000. (U.S.S.G. § 5E1.2(c)); (PSR at ¶ 92). This offense requires a term of supervised release of at least 1 year and up to a maximum supervised release term of 3 years. (U.S.S.G. § 5D1.2(a)(2)); (PSR at ¶ 87). The government concurs with the PSR's Guidelines calculations.

The provisions of the Mandatory Victims Restitution Act apply to this offense pursuant to 18 U.S.C. § 3663A, and restitution shall be ordered in an amount to be determined by the Court with joint and several liability for Ms. DeGidio Dunn. (PSR at ¶¶ 20, 94). The government anticipates that restitution will be $1,000 to J.R. for J.R.'s insurance deductible and approximately $30,579 to J.R.'s insurance provider.[2]

### III. SENTENCING FACTORS AND THE NEED FOR A SENTENCE WEIGHTED TOWARD COMMUNITY SERVICE RATHER THAN SUBSTANTIAL IMPRISONMENT

The government respectfully requests that the Court sentence Ms. DeGidio Dunn to 6–12 months of imprisonment, which represents a substantial downward variance from the advisory range of imprisonment of 24–30 months. The government further requests that the Court impose no fine in order to prioritize restitution.

The government also requests that the Court impose a supervised release term of three years and that, as part of her release conditions, Ms. DeGidio Dunn be ordered to perform substantial community service. Under 18 U.S.C. § 3563(b)(12), the Court may provide that a defendant "work in community service as directed by the court" as part of a sentence. Generally, a sentencing court has very broad discretion in imposing supervisory conditions, so long as the conditions bear "a reasonable relationship to the treatment of the accused and the protection of the public." *United States v. Arthur*, 602 F.2d 660, 664 (4th Cir. 1979) (citation

---

[2] The government has continued to provide Probation and the defendant with additional information that it has received about financial losses incurred as a result of the arson-related damage at the Great Health store on May 28, 2020. The government will supplement the record expeditiously if and when it receives additional information. Specifically, the government is currently seeking additional clarification from J.R.'s insurer about the nature of some of the damages that it has paid, which could have the result of lowering the restitution amount attributable to Ms. DeGidio Dunn.

omitted). Moreover, "such [community service] sentences require that the defendant become personally involved—devoting both time and energy—in a project that serves the public interest, and thereby inculcate in the defendant a sense of social responsibility." *United States v. John Scher Presents, Inc.*, 746 F.2d 959, 963 (3rd Cir. 1984). *See United States v. Pastore*, 537 F.2d 675, 681 (2nd Cir. 1976) (noting that the "donation of charitable services to the community is both a deterrent to other potential offenders and a symbolic form of restitution to the public for having breached the criminal laws"); *see also United States v. Restor,* 679 F.2d 338, 341 (3rd Cir. 1982) (emphasizing that "community service work was necessary to ... integrate [defendants] in a working environment, and inculcate in (them) a sense of social responsibility") (internal quotation marks omitted) (alteration in original).

Here, the government respectfully submits that community service is a fitting and crucial component of a sentence for Ms. DeGidio Dunn. It can offer recompense to the broader community by ensuring that Ms. DeGidio Dunn devotes time and energy to the important work of rebuilding and restoring damaged neighborhoods. J.R., the victim small business owner, stated, "I truly hope the defendant understands the impact, learns from and never repeats again. I sincerely hope she can change and go out into the world and make a positive impact on the future without utilizing violence and destruction." *See* Dkt. 85. To fulfill J.R.'s hope, community service can perhaps instill in Ms. DeGidio Dunn a lesson about social responsibility so that she is never inclined to repeat this type of criminal conduct. To that end, in anticipation of sentencing in this case, the government has reached out to various charitable organizations in the Twin Cities area devoted to helping small

7

businesses and families impacted by the difficult events of the last year, including civil unrest and the pandemic. Some of these organizations could be candidates for Ms. DeGidio Dunn to perform service that is meaningful and impactful for her and the community. The government has shared this information with the defense and Probation and can provide the Court with further details.

Accordingly, and as further addressed below, the government respectfully asserts that a sentence of 6-12 months' imprisonment—together with community service focused on rebuilding and restoring damaged neighborhoods—is appropriate in light of the sentencing factors under 18 U.S.C. § 3553 most pertinent to this case— namely, (1) defendant's history and characteristics; (2) the nature and circumstances of the offense; (3) the need for the sentence to promote respect for the law and to afford adequate deterrence; and (4) the need for a sentence that will ensure Ms. DeGidio Dunn receives appropriate treatment and counseling.

A. **Ms. DeGidio Dunn's History and Characteristics.**

A sentence weighted toward community service and treatment, rather than a substantial prison term, is appropriate in light of Ms. DeGidio Dunn's history and characteristics. Ms. DeGidio Dunn is 20 years old but was 19 years old at the time of the instant offense. (PSR at p. 2). Ms. DeGidio Dunn's childhood was marked by instability and tragedy. She was raised by her mother in the Twin Cities area, and her father was not involved in her upbringing. (*Id.* at ¶ 47). Though Ms. DeGidio Dunn's mother provided a stable household with adequate finances, her mother had a history of alcohol abuse and mental health issues, including an attempted suicide when Ms. DeGidio Dunn was age 5 or 6. (*Id.*). Ms. DeGidio Dunn eventually moved

to Moorhead, where her mother began dating a man who was physically abusive towards Ms. DeGidio Dunn. (*Id.* at ¶ 48). While in Moorhead, her mother allowed Ms. DeGidio Dunn's uncle to live with them upon his release from prison. (*Id.* at ¶ 49). Ms. DeGidio Dunn's uncle went on a crime spree and engaged in a shootout with authorities at Ms. DeGidio Dunn's Moorhead apartment. (*Id.*). Ms. DeGidio Dunn reports that she was present and hid behind a couch as bullets flew threw walls. (*Id.*).

After this traumatic incident, Ms. DeGidio Dunn's mother moved Ms. DeGidio Dunn and her brother to Starbuck, Minnesota, to temporarily live with Ms. DeGidio Dunn's brother's grandparents. (*Id.* at ¶ 50). When Ms. DeGidio Dunn was about age 11, she convinced her mother to enter a substance abuse treatment program. (*Id.* at ¶ 51). Sadly, two years later, when Ms. DeGidio Dunn was age 13, her mother died from cancer. (*Id.* at ¶¶ 51-52). At this time, her mother's boyfriend abandoned Ms. DeGidio Dunn and her brother, and both went to live with her brother's grandparents again in Starbuck. (*Id.* at ¶ 52). Since age 18, Ms. DeGidio Dunn reconnected and began living with her father, and at other points with a long-term boyfriend and other friends. (*Id.* at ¶¶ 54-56). These are all tragic and trying events that no one should have to endure, let along someone as young as Ms. DeGidio Dunn. The government acknowledges that Ms. DeGidio Dunn's pending case is in many ways the unfortunate by-product of a youth impacted by instability and trauma.

Ms. DeGidio Dunn also suffers from mental health issues. Ms. DeGidio Dunn reports a history of depression, mood disorders, and suicidal ideations since age 14 or 15. (*Id.* at ¶ 60). Ms. DeGidio Dunn has engaged in self-harm and was hospitalized for suicidal ideation in December 2019. (*Id.*). In January 2020, Ms. DeGidio Dunn

was diagnosed with recurrent major depressive disorder, generalized anxiety disorder, and primary insomnia. (*Id.* at ¶ 61). Unfortunately, Ms. DeGidio Dunn's mental health issues appears to have led to substance abuse. She reports that she has used marijuana daily from age 16 to cope with mental health symptoms. (*Id.* at ¶ 66). Ms. DeGidio Dunn submitted a positive random drug test for marijuana in November 2020 while on pre-trial supervision. (*Id.* at ¶ 67). However, an assessment in July 2020 recommended no further treatment programming but recommended that Ms. DeGidio Dunn comply with mental health counselling. (*Id.* at ¶ 68).

Despite the setbacks in her life, Ms. DeGidio Dunn received her high school diploma, and she has held various short-term jobs. (*Id.* at ¶¶ 70, 74-79). Since November 2020, Ms. DeGidio Dunn has been employed as a personal companion worker for disabled adults. (*Id.* at ¶ 74). Ms. DeGidio Dunn has no criminal history. (*Id.* at ¶¶ 40-43). All of these challenges that Ms. DeGidio Dunn has endured in her young life in no way excuse her criminal conduct—many other individuals faced with similar obstacles do not resort to criminality—but they do contextualize her behavior. The traumas Ms. DeGidio Dunn has suffered are certainly mitigating factors as are her struggles with mental health. In light of these mitigating factors, the government respectfully submits that a custodial term substantially below the Guidelines range sentence is sufficient but not greater than necessary combined with community service and counseling.

### B. Seriousness of the Offense and the Need for Deterrence and Promotion of Respect for the Law.

Ms. DeGidio Dunn's crime was undoubtedly serious. The arson took place on the heels of the tragic murder of George Floyd. However, Ms. DeGidio Dunn's actions

were in no way an expression of peaceful protest or lawful demonstration. Far from it—her actions were lawless, dangerous, and destructive. She joined with others with the clear purpose of trying to burn the Great Health and Nutrition store. Thankfully, Ms. DeGidio Dunn's intention to commit arson was not fulfilled despite her efforts to the contrary. However, the consequences of her intended arson conduct could easily have been catastrophic, even lethal. The whole strip mall in which the Great Health store was located could have been engulfed. To be clear: an aggravating factor is that Ms. DeGidio Dunn's intentional and callous actions risked the lives of anyone who was in the area, the safety of first responders, and most concretely, the livelihood of a small business and its employees. J.R.'s statement certainly makes clear how seriously this crime has affected J.R., resulting in a lasting, damaging impact that will not soon subside. (Dkt. 85). Accordingly, the government respectfully submits that a term of incarceration (in the range of 6-12 months) is necessary to punish this serious crime, promote respect for the law, and to deter others from engaging in similar reckless behavior.

Notwithstanding the highly serious nature of the offense, it does warrant emphasis that, in mitigation, Ms. DeGidio Dunn called an FBI tip line on June 8, 2020, after she saw her "suspect wanted" image circulating in the media. (PSR at ¶ 16). While she did not fulsomely explain her own conduct when contacting the FBI, Ms. DeGidio Dunn nonetheless helpfully provided her contact information, disclosed her presence at "the great health building," and shared other useful details. (*Id.*). The government acknowledges Ms. DeGidio Dunn's laudable effort to self-report to

law enforcement and asks that the Court consider her initiative in doing so when the Court fashions an appropriate sentence.

### C. An Appropriate Sentence Provides for Needed Counseling and Treatment.

Finally, a particularly important sentencing factor for consideration in this case is a sentence that will provide Ms. DeGidio Dunn with needed treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2)(D). As discussed above, Ms. DeGidio Dunn has several mental health conditions, and she will benefit from all appropriate treatment and counseling (as well as any potential substance abuse treatment). Accordingly, the government requests that Ms. DeGidio Dunn be ordered to receive counseling and treatment from the BOP and/or while on supervised release.

## CONCLUSION

For the reasons set forth above, the government respectfully recommends that the Court sentence Ms. DeGidio Dunn to a 6-12 months' imprisonment term (substantially below the Guidelines range) as well as community service. Such a sentence will strike an appropriate balance between providing a just punishment that promotes respect for the law while also ensuring that Ms. DeGidio Dunn receives counseling and a path toward reformation through service.

Dated: May 3, 2021                           Respectfully submitted,

                                             W. ANDERS FOLK
                                             Acting United States Attorney

                                             /s/ *Matthew S. Ebert*
                                       By:   MATTHEW S. EBERT
                                             JOSEPH S. TEIRAB
                                             Assistant United States Attorneys